# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

WILLIAM JENKINS,

    Plaintiff,

-vs-

KARL NELL,

    Defendant.

Civil Action No. 4:19-CV-2

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff William Jenkins and complains of Defendant Karl Nell as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff William Jenkins is a white male and resident of Chatham County, Georgia.

2. Defendant Karl Nell is an African-American male and resident of Beaufort County, South Carolina. Nell is employed as the head of crane operations for the Georgia Ports Authority at the Port of Savannah, within the Southern District of Georgia. He is sued in his individual, not official, capacity here.

3. Defendant Nell's purposeful, continuous, and systematic contacts with Georgia, in the form of his regular employment and work at the Port of Savannah, subject him to the personal jurisdiction of this Court.

4. This Court properly exercises subject-matter jurisdiction over the claims pleaded herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to the pleaded claims occurred here.

## FACTUAL ALLEGATIONS

6. Plaintiff Jenkins was an employee of the Georgia Ports Authority at the Port of Savannah for several years, and he received positive reviews of his work throughout his time there. In February 2016, he became a crane operator, and he worked in that capacity at the Port of Savannah for more than a year.

7. Defendant Nell became the head of crane operations in July 2016. Since he assumed this position, Nell has made clear to Plaintiff Jenkins and other crane operators that he is a vindictive boss willing to retaliate against anyone who questions his decisions or crosses him.

8. Nell told Jenkins and many other crane operators that he had "Human Resources [HR] in his back pocket," that he would know if anyone complained to HR about him, and that he had the "power of the pen," meaning that he had an ability to write them up for disciplinary infractions and potentially fire them based on nothing more than his say-so.

9. Since Nell became the head of crane operations, he has targeted numerous crane operators to bully and harass with demeaning comments and trumped-up disciplinary actions. Repeatedly, Nell has invented false claims of misconduct against crane operators in an attempt to provide a pretextual basis for suspending or terminating the targeted crane

operators. Without exception, the crane operators that Nell has chosen to target in this manner are white.

10. Since Nell became head of crane operations at the Port of Savannah, numerous crane operators have been terminated, have resigned, have retired early, or have attempted to transfer out of that department as a result of Nell's bullying, vindictive, and discriminatory actions. With only one exception, the crane operators who have left or have been fired are white.

11. The only exception is an African-American crane operator who had to be fired after a serious accident: slamming a cargo container into the housing of a ship. Even then, Nell told a number of other crane operators that if that African-American crane operator had only listened to him and changed his statement about the event, he could have kept his job.

12. For several years, some of the Port's cranes have experienced mechanical, electrical, and software issues that have caused malfunctions in their slowdown mechanisms. These malfunctions can cause "hard landings" of cargo containers being transferred from a ship to a truck by crane.

13. In December 2016, a crane operated by Jenkins experienced a malfunction of its slowdown mechanism. That malfunction resulted in a hard landing of the container being transferred. Upon information and belief, this malfunction was caused by recent changes to the crane's software.

14. Immediately after the incident, Jenkins gave a statement to the Georgia Ports Authority Police Department at the direction of the crane manager on duty. In that statement,

Jenkins told the police truthfully that his crane bypassed the slowdown mechanism, causing the "spreader bar" to "land hard" on the container.

15. After making that statement, Jenkins was instructed by two crane managers, both acting at the direction of Nell, to alter and falsify his statement by removing any language suggesting that the crane bypassed the slowdown mechanism.

16. In a sticky note attached to Jenkins's statement, Nell – in his own handwriting – directed Jenkins to "rewrite" the portion of the statement which indicated that "the spreader bar landed hard on the box."

17. Jenkins refused to falsify his statement to Port police. If Jenkins had followed Nell's directions, he would have committed a state felony offense prohibiting the submission of false statements to law enforcement pursuant to O.C.G.A. § 16-10-20.

18. Jenkins's refusal to falsify this report infuriated Nell, and Nell began targeting Jenkins as one of many white crane operators that he vindictively harassed and targeted for false disciplinary actions.

19. On August 2, 2017, Jenkins asked Nell for a weekend off. Nell denied the request, falsely claiming that another employee – Lonnie Benton – had already requested the same time off. In fact, Benton did not request that time off until the day after Nell denied Jenkins's request. By denying Jenkins's request, Nell ignored longstanding Port policy regarding leave requests in order to act against Jenkins.

20. Jenkins, troubled by Nell's unjustified disregard for policy and by Nell's apparent intent to punish or discriminate against him, made an appointment with the Port's

Human Resources Department to grieve Nell's August 8, 2017 decision. The appointment was set for the morning of August 9, 2017.

21.     The Port's Employee Handbook provides that "all aspects of the grievance process . . . are to remain confidential" and will only be shared in certain limited circumstances. The Handbook also says that "GPA is committed to providing a grievance procedure in which employees feel free to participate without fear of reprisals. Managers are prohibited from retaliating against any employee for filing a grievance or participating in the Grievance Procedure as a party or witness."

22.     Despite these explicit promises of confidentiality and protection, the Port's Human Resources Department told Nell on August 8, 2017, that Jenkins had requested a meeting the following morning.

23.     Jenkins was scheduled to work the night shift at the Port on August 8, 2017. When he arrived for his shift, he was met by Nell. In an intimidating manner, Nell told Jenkins that he knew about the scheduled meeting with HR, and he threatened that Jenkins "better have his facts straight" before saying anything during that meeting.

24.     Without any cause whatsoever, Nell ordered that Jenkins return home instead of working his scheduled shift. While angry and upset over Nell's intimidating and baseless harassment, Jenkins nevertheless complied with Nell's instructions and left the Port about five minutes later.

25. Nell thwarted Jenkins's attempts to meet with HR the following morning. Before the scheduled meeting, Jenkins received a voicemail from Nell that informed him that the meeting was cancelled and that he was being placed on administrative leave.

26. Jenkins was later instructed by HR to appear for a meeting on August 11, 2017. When Jenkins arrived, he saw Nell enter the HR building before him. That day, Jenkins was terminated from his employment with the Port. At no point before termination did anyone from HR meet with Jenkins to hear his grievance, or allow him to present his side of the story or permit him to complain about Nell's bullying, harassing, and discriminatory actions.

27. Jenkins requested that his termination be reviewed. During the review, held on August 14, 2017, Port executives Dan Rhode and Jim Wisham told Jenkins that he was terminated for failing to obey Nell's August 8, 2017 order to immediately leave the Port. The reason given for Jenkins's termination is false and pretextual, and based upon false statements made by Nell. Jenkins had, in fact, left the Port within approximately five minutes of Nell's instruction.

28. The Port also suggested that Jenkins was terminated for aggressively and insubordinately confronting Nell. This explanation, too, is false and pretextual. To start, it was Nell – not Jenkins – that aggressively began the confrontation by stopping Jenkins before his shift and telling him to "get his facts straight" before he went to a supposedly confidential meeting with HR.

29. Moreover, a similarly-situated African-American crane operator, Randy Jones, once told Nell that he would "take [Nell] outside and put his foot up his ass," yet Jones

suffered no disciplinary consequence whatsoever. To the extent that Jenkins confronted Nell for his failure to follow Port policy regarding leave requests, Jenkins received disparate punishment. His employment was terminated while Jones received no punishment.

30. Jenkins attended a post-termination review, but it was pretextual and offered Jenkins no real procedural remedy. During the review, Jenkins attempted to explain the circumstances that actually led to his termination: Nell's bullying, harassing, and discriminatory actions as head of crane operations, triggered against Jenkins as a result of Jenkins's refusal to alter his statement about the malfunction of his crane's slowdown mechanism. Jenkins attempted to provided the names of witnesses to substantiate his version of events, and attempted to provide examples of other crane operators against whom Nell had discriminated. He showed them the police report with Nell's handwritten order to alter the report.

31. Port executives Rhode and Wisham refused even to consider or listen to Jenkins's explanations. Upon information and belief, none of Jenkins's witnesses were interviewed before Jenkins's termination was upheld.

32. The decision to terminate Jenkins was made by Nell, at Nell's urging, and upon false information provided by Nell to HR and Port executives.

33. After Jenkins was wrongfully terminated by the Port, he attempted to obtain employment with Ports America, an entity that operates on Port grounds.

34. Jenkins properly entered the Port, drove to the Ports America building, and picked up an employment application.

35. As Jenkins drove toward the Port's exit, he was stopped and detained by a Port police officer. The officer spoke with someone by phone. Upon information and belief, the person contacted by the officer either was Nell or was acting at the direction of Nell. Based on the call, the officer instructed Jenkins that he was banned from all Port property.

36. That ban – still in place – is improper and unprecedented. It prevents Jenkins from obtaining employment with the numerous stevedores and other entities that do business on the Port, for whom Jenkins's experience would be a perfect fit. Jenkins received no advance notice he was banned from Port property and no hearing to challenge the ban.

## CAUSES OF ACTION

### *COUNT ONE*
### 42 U.S.C. §§ 1981, 1983
### RACIAL DISCRIMINATION

37. Plaintiff Jenkins renews and reaffirms each and every allegation of paragraphs 1 through 36.

38. Federal law prohibits discrimination against an employee in the terms and conditions of employment because of that employee's race. By the conduct above-described, Defendant Nell intentionally discriminated against employee Plaintiff Jenkins by making false disciplinary allegations and terminating Jenkins's employment on the basis of Jenkins's race.

39. As a result of Defendant Nell's discrimination, Plaintiff Jenkins wrongfully has been terminated from his employment and denied employment opportunities providing substantial compensation and benefits, thereby entitling him to equitable monetary relief; and

has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Defendant Nell's actions, thereby entitling him to compensatory damages.

40. In these discriminatory actions, Defendant Nell has acted with actual malice and reckless indifference to Plaintiff Jenkins's rights, thereby entitling Jenkins to an award of punitive damages.

41. Additionally, Plaintiff Jenkins is entitled upon prevailing on this claim to his reasonable attorneys' fees, litigation expenses, and costs.

### *COUNT TWO*
### 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION

42. Plaintiff Jenkins renews and reaffirms each and every allegation of paragraphs 1 through 41.

43. The First Amendment to the Constitution of the United States protects a public employee's freedom of speech on matters of public concern. It is unlawful for a public employer to take action against a public employee because the employee exercises his First Amendment rights by speaking on a matter of public concern.

44. Plaintiff Jenkins spoke on matters of public concern by refusing to alter his police statement that highlighted a recurring problem with the Port cranes' "slowdown" mechanism and by publicly commenting on Nell's unlawful requests that he do so.

45. The chronically malfunctioning "slowdown" equipment on Port cranes is a matter of public concern. The fact that the head of crane operations at the Port instructed an

operator to falsify a police report to hide those problems is similarly a matter of public concern.

46. Plaintiff's interest in speaking the truth about these matters clearly outweighs any interest the Port would have in efficient public service. If left unaddressed, defects in the "slowdown" mechanisms exposed those working with and near the cranes to personal injury, and exposed the Port itself to serious civil liability for those injuries.

47. By making these statements, Plaintiff Jenkins exposed Nell to criticism for Nell's illegal and unwarranted instructions that Jenkins change his report. Plaintiff Jenkins's protected speech was a motivating factor and substantial part of Defendant Nell's decision to make false statements that would result in the termination of Jenkins's employment. Plaintiff Jenkins would not have been terminated absent his protected speech.

48. Because Jenkins had voiced his concerns regarding the crane malfunctions and exposed Nell's illegal instructions to cover it up, Nell concocted a false and pretextual reason to terminate Jenkins's employment.

49. Nell's unjustified and illegal actions were taken under color of state law and in violation of clearly established law.

50. As a result of Defendant Nell's retaliation, Plaintiff Jenkins has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling him to compensatory damages.

51. Defendant Nell has acted with malice and reckless indifference to Plaintiff Jenkins's rights, thereby entitling Jenkins to an award of punitive damages.

52. Additionally, Plaintiff Jenkins is entitled upon prevailing on this claim to his reasonable attorneys' fees, litigation expenses, and costs.

### *COUNT THREE*
### 42 U.S.C. § 1983
### DEFAMATION OF REPUTATIONAL LIBERTY

53. Plaintiff Jenkins renews and reaffirms each and every allegation of paragraphs 1 through 52.

54. Attending Jenkins's termination, Defendant Nell publicly made false statements of a stigmatizing nature without any meaningful opportunity for Jenkins to clear his name.

55. Specifically Defendant Nell falsely stated that, on the night Nell confronted Jenkins about his scheduled meeting with HR, Jenkins was "very aggressive" with him, that Nell "honestly thought [Jenkins] was going to hit me," and that Jenkins was "physically threatening."

56. Defendant Nell additionally has spread false information among crane operators at the Port that he feared for his safety and needed to "watch his back" because of potential physical threats by Jenkins.

57. Finally, upon information and belief, Defendant Nell himself – or someone

acting at his direction – provided false information about Jenkins to Port police that led them to remove and bar him from entering the Port, preventing Jenkins from seeking alternative employment for which he is eminently qualified.

58. These statements by Nell stigmatized Jenkins and significantly impaired Jenkins's freedom to take advantage of other employment opportunities.

59. As a result of Defendant Nell's statements, Plaintiff Jenkins has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling him to compensatory damages.

60. Defendant Nell has acted with malice and reckless indifference to Plaintiff Jenkins's rights, thereby entitling Jenkins to an award of punitive damages.

61. Additionally, Plaintiff Jenkins is entitled upon prevailing on this claim to his reasonable attorneys' fees, litigation expenses, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jenkins prays for the following relief:

(A) For lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

(B) For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

(C) For punitive damages in an amount to be determined at trial;

(D) For interest on lost wages, compensation, and damages, including pre- and post-judgment interest;

(E) For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988(b) and other laws; and

(F) For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Jenkins demands trial by jury on all claims stated in this Complaint.

**THIS THE 2nd DAY OF January, 2019.**

Respectfully submitted,

SAVAGE TURNER DURHAM PINCKNEY & SAVAGE

By:    s/ Brent J. Savage
       Brent J. Savage
       Georgia Bar No. 627450
       R. Brian Tanner
       Georgia Bar No. 697615

102 East Liberty Street, 8th Floor
Post Office Box 10600

Savannah Georgia 31412
Phone: (912) 231-1140
Fax: (912) 232-4212