IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

WILLIAM JENKINS,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        CASE NO. CV419-002
                                    )
KARL NELL, in his Individual        )
Capacity,                           )
                                    )
        Defendant.                  )
                                    )

## O R D E R

Before the Court is Defendant Karl Nell's Motion for Summary Judgment. (Doc. 29.) For the following reasons, Defendant's motion is **GRANTED.**

### BACKGROUND

Plaintiff William Jenkins, a former crane operator for the Georgia Ports Authority ("GPA"), claims that Defendant Karl Nell terminated his employment based on Plaintiff's race. (Doc. 1.) Plaintiff is a white male who began working for GPA's Garden City, Georgia facility in 2015. (Doc. 29, Attach. 2 at ¶¶ 2-3.) Plaintiff became a crane operator for GPA in February 2016 and remained in this role until his termination in August 2017. (Id. at ¶ 3.) As a crane operator, Plaintiff moved large containers between ocean-bound ships and trucks on the docks. (Id. at ¶ 2.) At all relevant times, Defendant, an African-American male, was the General Manager of Crane Operations at the Garden City facility

and Plaintiff's supervisor. (Doc. 29, Attach. 12 at ¶ 1; Doc. 29, Attach. 12 at ¶ 4.) In 2017, Plaintiff received a satisfactory performance review from GPA and Defendant. (Doc. 29, Attach. 2 at ¶ 13; Doc. 29, Attach. 4 at 148.)

In August 2017, Plaintiff asked Defendant if he could have a day off on August 5, 2017. (Doc. 29, Attach. 2 at ¶ 15; Doc. 29, Attach. 4 at 16-17.) Plaintiff, however, did not submit a formal request for an off-day, but simply talked to Defendant. (Doc. 34, Attach. 20 at 20.) Defendant denied Plaintiff's request because another crane operator, Lonnie Benton, had requested off for the same day before Plaintiff. (Doc. 29, Attach. 12 at ¶¶ 11, 13; Doc. 29, Attach. 12 at 13; Doc. 29, Attach. 4 at 17.) Plaintiff did not respond to Defendant's denial of his request at that time. (Doc. 34, Attach. 20 at 20.)

The Crane Department's policy is to grant off-days on a first-come, first-serve basis. (Doc. 29, Attach. 12 at 15.) If a crane operator requests a weekend-day off, the operator must "secure a benefit" by using an additional day of vacation time. (Id.; Doc. 34, Attach. 20 at 21.) Plaintiff claims that Benton did not secure a benefit before requesting August 5th off and, therefore, did not properly request the day off before Plaintiff. (Doc. 34, Attach. 20 at 21.)

A few days later, on August 8, 2017, Plaintiff went to the Human Resources Department ("HR") to speak with Jim Wisham, the HR

Recruiting Manager, about Defendant's denial of Plaintiff's request for a day off. (Doc. 29, Attach. 4 at 17-18.) When Plaintiff arrived, Wisham was leaving the office and, rather than meet with another HR manager, Plaintiff scheduled an appointment with Wisham for the next day. (Doc. 34, Attach. 20 at 24.) Plaintiff testified that he wanted to speak specifically with Wisham because he "felt safest with [] Wisham." (Id. at 24.)

Rosa Simmons, the HR Manager, overheard Plaintiff make an appointment to meet with Wisham and e-mailed Defendant about the appointment. (Doc. 34, Attach. 25 at 13.) Simmons's e-mail to Defendant stated: "Karl, Billy Jenkins, crane operator came up here to make an appointment to talk to Jim [Wisham]. Anything going on with him we should know about?" (Id.) Defendant testified that Simmons also called him to ask if he knew why Plaintiff went to HR. (Id. at 12.)

On the same evening, August 8, 2017, at approximately 5:53 p.m., Defendant approached Plaintiff in the Crane Operations Center before Plaintiff's shift and asked Plaintiff to meet with him in a different room.[1] (Doc. 29, Attach. 2 at ¶ 16; Doc. 34,

---

[1] Plaintiff testified that he knows approximately what time Defendant approached him because employees set their cellphone alarms to ring at 5:53 p.m. and the alarms were ringing when Defendant approached Plaintiff. (Doc. 34, Attach. 20 at 46.) Defendant, however, stated in an e-mail on August 8 that the conversation occurred at 6:00 p.m. (Doc. 29, Attach. 12 at 15.) Viewing the facts in the light most favorable to Plaintiff, the Court will consider 5:53 p.m. as the time Defendant approached Plaintiff.

3

Attach. 1 at 1-2; Doc. 34, Attach. 20 at 46.) The two men walked into an office adjacent to the main area and Defendant said to Plaintiff: "I hear you have an appointment with HR." (Doc. 29, Attach. 4 at 19.) Plaintiff told Defendant that he did make an appointment with HR and Defendant then said, "[y]ou better have your facts straight." (Id.) Plaintiff responded, "I do." (Id. at 20.) According to Plaintiff, Defendant became "visibly upset." (Id.) Plaintiff then told Defendant "you've got to get out of my face" and "you will not intimidate me." (Id.; Doc. 34, Attach. 20 at 30.)

Defendant and Plaintiff walked out of the room and Defendant instructed Plaintiff to leave work and go home. (Doc. 29, Attach. 2 at ¶ 17; Doc. 34, Attach. 1 at 2.) Plaintiff responded, "I am not going home, I did nothing wrong." (Doc. 29, Attach. 4 at 22.) Defendant then said to Matt Sterrett, the Assistant Manager of Crane Operations, "[Plaintiff is] being sent home." (Doc. 29, Attach. 4 at 23.) Plaintiff again responded, "I'm not going anywhere, I did nothing wrong, I'm not going home, I did nothing wrong." (Id.) Defendant, in response, told Plaintiff to meet him at the HR Department in the morning. (Doc. 29, Attach. 2 at ¶ 18.) Defendant then left the crane operations building and, according GPA records, exited the facility's external gate at 6:03 p.m. (Doc. 29, Attach. 2 at ¶ 19; Doc. 34, Attach. 24 at 19.)

4

After Defendant left, Plaintiff clocked-in at the time clock. (Doc. 29, Attach. 4 at 24.) Next, Plaintiff walked into the breakroom, gathered his belongings, and stated to other employees in the room: "this is the kind of thing that is poisoning the department." (Doc. 29, Attach. 2 at ¶ 19; Doc. 29, Attach. 4 at 27.) Plaintiff did not clock-out for his shift. (Doc. 34, Attach. 20 at 36.) At 6:02 p.m., Plaintiff got in his truck and called his wife. (Doc. 34, Attach. 20 at 35; Doc. 34, Attach. 27 at 10.) GPA records show that Plaintiff exited the facility's external gate at 6:05 p.m. (Doc. 34, Attach. 24 at 19.)

Later that evening, at 9:33 p.m., Defendant sent an e-mail about his exchange with Plaintiff to Simmons, Lise Altman, the Chief Human Resources Officer, Dan Rohde, the Senior Director of Operations, and Ed McCarthy, the Chief Operating Officer. (Doc. 29, Attach. 12 at 15.) In the e-mail, Defendant stated that he "had a conversation with [Plaintiff] about his work schedule . . . .", explained that the crane department's policy on day-off requests "is a first come first serve basis," and stated that "Lonnie Benton requested off before [Plaintiff]." (Id.) Defendant also stated that "[Plaintiff] was not told about Lonnie but feels he should be off despite our policy." (Id.) Defendant further stated:

> [Plaintiff's] response was not acceptable nor appreciated; therefore, I sent [Plaintiff] home tonight without pay and to report to HR in the morning for these reasons:

> (1) [Plaintiff] was disrespectful and aggressive. He was yelling "you are not going to intimidate me" and "get out of my face." I was walking to the office to inform Matt Sterrett to take him off the schedule.
> (2) [Plaintiff] said "I'm not going anywhere." I told Matt a second time to take him off of the schedule and to go home.
> (3) [Plaintiff] went into the lounge to muster a crowd. He was inciting others to join him yelling that "I sent him home" and "y'all see what we dealing [sic] with" per Kerry Terrell.

(Id.)

The next day, August 9, 2017, Plaintiff was placed on administrative leave pending an investigation into Defendant's allegations. (Doc. 34, Attach. 20 at 38-39.) Altman directed Simmons and Tanya Chisholm, the HR Manager of Learning and Development, to investigate the incident between Defendant and Plaintiff. (Doc. 29, Attach. 2 at ¶ 21; Doc. 29, Attach. 11 at ¶ 6.) On August 10, as part of the investigation, Simmons and Chisholm interviewed Kerry Terrell and Randy Jones. (Doc. 29, Attach. 2 at ¶ 21; Doc. 29, Attach. 13 at ¶¶ 6-7; Doc. 29, Attach. 14 at ¶¶ 6-7.) Simmons and Chisholm memorialized their conversations with Terrell and Jones. (Doc. 29, Attach. 13 at 12, 16.) Terrell told Simmons and Chisholm that after Plaintiff and Defendant spoke, Plaintiff came out of the room and stated, "y'all need to know what we are dealing with." (Id. at 12.) Jones told Simmons and Chisholm that he heard Defendant tell Plaintiff to go

home and that Jones told Plaintiff, "if the boss man tells you to go home then you need to go home."[2] (Id. at 16.)

During the investigation, Simmons and Chisholm also received statements from assistant managers Matt Sterrett and Philip Wong. (Id. at 9.) Sterrett said: "I heard [Defendant] tell [Plaintiff] to go ahead and go home for the evening. That's when [Plaintiff] told [Defendant] that he is not going home." (Id. at 20.) Similarly, Wong stated:

> At approximately 17:50 when we were changing shifts, I witnessed [Plaintiff] and [Defendant] having a conversation in the separate office adjacent to the common office located in the maintenance building.
>
> Both [Defendant] and [Plaintiff] then came into the common office, and [Defendant] told [Plaintiff] that he needs to leave the premises. [] Matt Sterrett who was beginning the night-shift was directed to replace [Plaintiff] and find another crane operator to take his place on the assignment listing for the upcoming night shift.
>
> [Plaintiff] stated he was not leaving, and he was directed to leave. He then asked if he needed to check in and then check out, and so I told him not to do so and just to leave. At approximately 18:05 I saw [Plaintiff] leave the office.

(Id. at 22.)

As part of the investigation, Simmons also met with Defendant and they reviewed GPA's Code of Conduct. (Id. at ¶ 10; Doc. 29,

---

[2] As part of the investigation, Simmons and Eli Vandiver interviewed Jones a second time. (Id. at ¶ 8.) In that interview, Jones reiterated that Defendant told Plaintiff to go home and that Jones told Plaintiff it was in his best interest to go home. (Id. at 18.) Jones told Simmons and Vandiver that Plaintiff was still in the building when Jones clocked-out for the day. (Id.)

Attach. 12 at ¶ 16.) According to GPA's Code of Conduct, a violation of an "A" Rule "make[s] you subject to immediate discharge." (Doc. 29, Attach. 4 at 109.) Rule A-6 prohibits:

> Refusal or failure to carry out a reasonable direct order of a supervisor, insubordinate behavior towards a supervisor, or demonstrating gross disrespect for a supervisor by, among other things, cursing at a supervisor, verbally or physically threatening or intimidating a supervisor, or yelling at a supervisor in an abusive manner.

(Id. at 110.) Simmons and Defendant agreed that Plaintiff's refusal of a direct order to go home violated Rule A-6 and warranted termination. (Doc. 29, Attach. 13 at ¶ 10; Doc. 29, Attach. 12 at ¶ 16.)

Simmons provided Altman notes from the interviews with Terrell and Jones, the statements from Sterrett and Wong, and informed Altman of her and Defendant's conclusion that Plaintiff violated Rule A-6. (Doc. 29, Attach. 13 at ¶ 10; Doc. 29, Attach. 11 at ¶ 8.) Altman reviewed the witness statements and spoke with the managers of the HR Department about the incident, including Jim Wisham. (Doc. 29, Attach. 11 at ¶ 8.) After reviewing the facts and witness statements, Wisham concluded that Plaintiff's refusal violated Rule A-6 and that termination was warranted. (Doc. 29, Attach. 15 at ¶ 5.) Altman also concluded that Plaintiff's refusal to follow an order amounted to insubordinate conduct and that Plaintiff's conduct violated Rule A-6. (Doc. 29, Attach. 11 at ¶

9.) Ultimately, Altman determined that Plaintiff should be terminated. (Doc. 29, Attach. 11 at ¶ 11.)

Altman sent her recommendation to terminate Plaintiff to Ed McCarthy, GPA's Chief Operating Officer. (Doc. 29, Attach. 16 at ¶ 2.) McCarthy agreed with Altman's recommendation and also concluded that Plaintiff should be terminated. (Doc. 29, Attach. 16 at ¶ 3.) Dan Rohde, GPA's Senior Director of Operations, also reviewed the witness statements, reviewed Altman's recommendation, and concluded that Plaintiff should be terminated. (Doc. 29, Attach. 18 at ¶ 4.) Griff Lynch, GPA's Executive Director, gave the final approval for Plaintiff's termination. (Doc. 29, Attach. 11 at ¶ 8.)

On August 11, 2017, Plaintiff met with Simmons and Chisholm and they told Plaintiff that he was being terminated for refusing to follow a direct order to leave and violating Rule A-6 of GPA's Code of Conduct. (Doc. 29, Attach. 2 at ¶ 23; Doc. 34, Attach. 20 at 39.) Plaintiff requested that HR conduct a termination review. (Doc. 34, Attach. 20 at 41.)

In conjunction with his termination review, Plaintiff submitted a written statement about his interaction with Defendant. (Doc. 29, Attach. 13 at 24.) Plaintiff stated that "what [he was] accused of on [his] disciplinary action form and at [his] termination meeting is completely untrue." (Id.) Plaintiff provided his recollection of the exchange with Defendant:

> . . . I arrived for my scheduled shift at 1800 that
> evening and before I was even able to clock in,
> [Defendant] asked to speak with me. He led me to the
> ship operations office with no witnesses. . . . He
> immediately took a provocative tone of voice and began
> questioning me about my scheduled meeting with HR. He
> started the conversation with the statement, "[i]f
> you're going to HR on me, you better have your facts
> straight[.]" He assumed he knew what my meeting with HR
> was concerning and began to get very heated and defensive
> when I disagreed. His eyes got very wide and his lip was
> quivering. In a very aggressive move, he stepped forward
> and raised his voice and I honestly thought he was going
> to hit me. . . . The next thing I know, he told me to go
> home and to be at HR at 9 [a.m.] the following
> morning. . . .

(Id.) Plaintiff also stated that, in his meeting with Simmons and

Chisholm, he was not "allow[ed] to make a statement" and that they

did not "hear [him] out." (Id. at 25.) Plaintiff also alleged that,

at some point prior to the events in question, Defendant said:

"I'm vindictive. If you go to HR on me, I'll get you. I have the

power of the pen and I'll know before you leave their office. I

have HR in my back pocket." (Id. at 25-26.) Plaintiff concluded

that "[Defendant] and human resources have clearly created their

own reality to support a very one sided conclusion." (Id. at 26.)

Defendant submitted a statement in response to Plaintiff's

statement. (Id. at 28-32.) In his responsive statement, Defendant

claimed that he "decided to talk with [Plaintiff] about [GPA's]

vacation policy" because "Lonnie Benton told [Defendant] that

[Plaintiff] was upset that he had to work on Saturday . . . ."

(Id. at 28.) Defendant claimed that he "began the conversation

with 'I heard you are upset about working on Saturday, August

10

5th.' " (Id. at 28.) Plaintiff told Defendant that he was going to HR and Defendant told him "it's your right to go to HR and I hope you have your facts together." (Id. at 28.) Defendant further recalls that as they were leaving the room, Plaintiff yelled at Defendant to "get out of [his] face." (Id.) Defendant stated that he responded, "really, I'm not in your face" and Plaintiff yelled again, "get out of my face." (Id.) Defendant's statement further provides that "[b]ecause [Plaintiff] was visibly upset and yelled to get out of his face, I told [Plaintiff] to go home." (Id.) According to Defendant, Plaintiff then yelled "I'm not going anywhere." (Id.) Defendant alleged that Plaintiff stated he would not leave at least three times. (Id. at 28-29.)

After Plaintiff and Defendant submitted their statements, Dan Rohde and Jim Wisham reviewed the statements and, on August 14, 2017, met with Plaintiff. (Doc. 29, Attach. 2 at ¶ 24; Doc. 29, Attach. 15 at ¶ 7.) In the meeting, Wisham told Plaintiff the meeting was to "review the facts surrounding [Plaintiff's] termination" and Wisham noted that [Plaintiff] didn't address any of the reasons he was terminated." (Doc. 29, Attach. 15 at 6.) Rohde told Plaintiff that Rohde and Wisham "knew that [Plaintiff] was told at least three times to clock out and go home." (Id.) Rohde also told Plaintiff that HR had "witnesses that stated [Plaintiff] went to a common area and tried to cause dissention among the operators." (Id.) Plaintiff then told Rohde and Wisham

11

he wanted to end the meeting because they were not letting him tell his side of the story. (Id.) Rohde told Plaintiff if he had "left when he was told to, things may have turned out differently." (Id.) Plaintiff testified that Wisham and Rohde said he was terminated because he was told to go home, and he did not go home. (Doc. 34, Attach. 20 at 43.) Plaintiff's termination was ultimately upheld. (Doc. 29, Attach. 15 at ¶ 7.)

On January 2, 2019, Plaintiff filed suit in this Court against Defendant. (Doc. 1.) In his complaint, Plaintiff alleges that Defendant intentionally discriminated against him based on Plaintiff's race, in violation of 42 U.S.C. §§ 1981, 1983. (Id. at ¶¶ 37-42.) Now, Defendant has filed a motion for summary judgment seeking dismissal of Plaintiff's race discrimination claim.[3] (Doc. 29.) Plaintiff has responded in opposition. (Doc. 34.)

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no

---

[3] In his complaint, Plaintiff also raised a First Amendment retaliation claim and a claim for defamation of reputational liberty. (Doc. 1 at 9-11.) However, in his response to Defendant's motion for summary judgment, Plaintiff concedes that summary judgment should be granted on these two claims. (Doc. 34 at 31.) Accordingly, the Court will not address these claims and summary judgment is **GRANTED** on Plaintiff's First Amendment retaliation claim and claim for defamation of reputational liberty.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material

to its case. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. <u>Matsushita</u>, 475 U.S. at 587–88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u>, 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. <u>See</u>, <u>e.g.</u>, <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933–34 (11th Cir. 1989).

## ANALYSIS

### I.   MCDONNELL DOUGLAS FRAMEWORK

In his complaint, Plaintiff brought a claim against Defendant for race discrimination in violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983. (Doc. 1 at 8.) Defendant argues he is entitled to summary judgment on Plaintiff's § 1981 claim for two reasons. (Doc. 29, Attach. 1 at 13.) First, Defendant argues that Plaintiff has failed to produce evidence of a similarly situated employee that received more favorable treatment. (<u>Id.</u>) Second, Defendant

14

argues that even if Plaintiff can show a similarly situated employee, he has failed to establish that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff's employment was pretext for discrimination. (Id. at 16.)

"Section 1981 . . . prohibits public employers from terminating contracts on the basis of an employee's race." Bush v. Houston Cnty. Comm'n, 414 F. App'x 264, 266 (11th Cir. 2011) (citing Ferrill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999)). See 42 U.S.C. § 1981. "In the employment context, § 1981 . . . claims require the same elements of proof and involve the same analytical framework as Title VII claims." Bush, 414 F. App'x at 266. See also Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1335 n.7 (11th Cir. 2015) ("Though [the plaintiff] brought claims under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983 as well, their fates rise and fall with his Title VII claim."); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework"). To prevail on a claim of discriminatory discharge under Title VII, Plaintiff must prove that Defendant intentionally discriminated against him based on Plaintiff's race. Billingslea v. Graphic Packaging Int'l, Inc., No. 5:13-cv-16 (CAR), 2014 WL 5668122, at *5 (M.D. Ga. Nov. 4, 2014) (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir.

2005)). Where, as here, a plaintiff attempts to prove discriminatory intent based only on circumstantial evidence, the Court employs the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).

Under the McDonnell Douglas framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. If a plaintiff can demonstrate the elements of a prima facie case, then a burden of production falls to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Lewis v. City of Union City, Ga., 918 F.3d 1213, 1221 (11th Cir. 2019). If the employer articulates a legitimate, non-discriminatory reason, the burden then shifts back to the plaintiff to demonstrate that the employer's stated reason was a pretext for discrimination. Id. The Court will address each step of the McDonnell Douglas framework below.

A. Prima Facie Case

First, to establish a prima facie case of discrimination, Plaintiff must prove four elements: (1) that he belongs to a protected class, (2) that he was subjected to an adverse employment action, (3) that he was qualified to perform the job in question, and (4) that his employer treated "similarly situated" employees

16

outside his class more favorably. Lewis, 918 F.3d at 1220-21. Three of the elements are uncontested. Defendant, however, argues that he is entitled to summary judgment because Plaintiff has failed to identify a similarly situated comparator who was treated more favorably. (Doc. 29, Attach. 1 at 13.)

The United States Court of Appeals for the Eleventh Circuit has held that the comparator analysis must be conducted at the prima facie stage of the McDonnell Douglas burden-shifting framework and that "a plaintiff asserting an intentional-discrimination claim under McDonnell Douglas must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.' " Lewis, 918 F.3d at 1218. Generally, a similarly situated comparator will have "engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's disciplinary history." Id. at 1227-28.

In his response, Plaintiff identifies three comparators: Randy Jones, Brian Jackson, and Michael Saussy. (Doc. 34 at 22-25.) Plaintiff's comparators worked as crane operators under Defendant's management and Plaintiff argues that each comparator "engaged in misconduct deemed to be of the same severity (an 'A'-

level violation) . . . as that purportedly committed by [Plaintiff]." (Id. at 22-23.) Plaintiff contends that these three men were "subject to the same employment policy, guideline, or rule as" Plaintiff and were "under the jurisdiction of the same supervisor" as Plaintiff. Lewis, 918 F.3d at 1227-28. The question is, therefore, whether the men "engaged in the same basic conduct (or misconduct) as" Plaintiff: refusing to carry out a direct order from his supervisor. Defendant argues that none of these individuals are valid comparators because they did not engage in the same conduct as Plaintiff. (Doc. 38 at 2.) The Court agrees with Defendant and finds that Plaintiff has failed to present a proper comparator.

### 1. Randy Jones

First, Plaintiff identifies Randy Jones, an African-American male, as a comparator. (Doc. 34 at 23.) In a meeting with other crane operators and Defendant, Jones made a comment that if he "catch[es] [Defendant] out that gate [sic], [he will] whoop that ass." (Doc. 34, Attach. 22 at 6.) After Jones made the comment, Defendant asked Jones to meet with Defendant and Dan Rohde, Defendant's supervisor. (Id. at 7.) Defendant told Rohde that he felt threatened by Jones's comment and requested that Jones be terminated. (Id. at 8.) Jones told Rohde he was just "talking trash" when he made the comment to Defendant. (Id. at 8.) Rohde did not terminate Jones but, instead, asked Jones to return to the

meeting and apologize to Defendant and the other crane operators. (<u>Id.</u> at 10.) Jones complied with Rohde's instructions and apologized to the group. (<u>Id.</u> at 10.)

The Court finds that Jones is not a proper comparator because Jones's misconduct is distinguishable from Plaintiff's misconduct. Jones threatened his supervisor while Plaintiff refused a direct order from his supervisor. Even if, as Plaintiff argues, Jones's threat was a violation of the same GPA Code of Conduct Rule, Rule A-6, it was a materially different type of violation. See <u>Moore v. Ala. Dep't of Corr.</u>, 137 F. App'x. 235, 239 (11th Cir. 2005) ("Title VII does not prevent an employer from interpreting its rules as it chooses and making its determinations as it sees fit under such rules."); <u>Blash v. City of Hawkinsville & Pulaski Cty., Ga., Sheriff's Office</u>, No. 5:17-cv-00380-TES, 2019 WL 7340132, at *12 (M.D. Ga. Dec. 30, 2019) (concluding that although plaintiff's "alleged misconduct and the alleged misconduct of his comparators were both criminal in their nature, [plaintiff] . . . glosses over critical differences and paints with too broad a brush" (internal quotations omitted)). However, unlike Plaintiff, Jones was not formally charged with a violation of Rule A-6 or with a violation of any GPA rule. See <u>Moore</u>, 137 F. App'x. at 239 ("[A] difference in the charged offenses can preclude a comparison for Title VII purposes."). Moreover, unlike Plaintiff, Jones did not refuse an

order from his supervisor and promptly followed Rohde's directive to apologize to the group.

Most importantly, Defendant treated Jones's misconduct and Plaintiff's misconduct similarly and recommended that both employees be terminated. Thus, even if Jones's misconduct was sufficiently similar to Plaintiff's misconduct, Plaintiff cannot assert that Jones was treated more favorably. Accordingly, the Court finds that Jones is not a proper comparator because he is not similarly situated in all material respects.

### 2. Brian Jackson

Second, Plaintiff identifies Brian Jackson, an African-American male, as a comparator. (Doc. 34 at 24.) In March 2018, Jackson met with Chisholm and Wisham about Defendant. (Doc. 34, Attach. 27 at 8.) According to Chisholm and Wisham's notes, Jackson told them "other operators are afraid to come to HR and it's a living hell in the cranes department." (Id. at 8.) Jackson claimed Defendant made several intimidating statements, including:

- If you people keep going to HR (white house) on me, then I promise you—you will lose your jobs.
- If you throw me under the bus, then I will be like an eighteen-wheeler and run you over eighteen times.
- You will be pencil whipped if you go to HR.

(Id. at 9.) However, according to Chisholm and Wisham, Jackson did not file a formal complaint about Defendant. (Id. at 10.) Jackson

20

was not subject to any discipline for reporting these statements
to HR.

Plaintiff argues that Jackson engaged in the same basic
misconduct as he did because Jackson lied to HR about Defendant's
statements, which is a violation of Rule A-8 of GPA's Code of
Conduct. (Doc. 34 at 24-25.) Although Plaintiff provides no
evidence that Jackson lied to HR, Plaintiff argues that the Court
should assume Jackson lied because Defendant was not disciplined
for any of the conduct alleged by Jackson and, therefore, HR must
have determined Jackson's statements about Defendant were
fabricated. (Id.) Plaintiff further argues that if Jackson
violated Rule A-8 and was not terminated, Jackson was treated more
favorably than Plaintiff. (Id. at 25.)

Plaintiff's argument on this matter is merely speculative.
Plaintiff has failed to present evidence that Jackson lied to HR
or that Jackson was ever charged with a GPA Rule violation.
Moreover, even if Jackson did lie, Jackson's conduct is
distinguishable from Plaintiff's misconduct and would be a
violation of a different GPA rule. See Nelson v. Americold
Logistics, LLC, No. 1:18-cv-04846-SCJ, 2020 WL 1799945, at *2 (N.D.
Ga. Mar. 4, 2020) (finding that plaintiff presented an invalid
comparator where the comparator violated a different work rule).
Additionally, Plaintiff has not shown how Defendant treated
Jackson more favorably or that Defendant disciplined Jackson at

21

all for speaking with HR. Accordingly, the Court finds that Jackson is not a proper comparator because he is not similarly situated in all material respects.

### 3. Michael Saussy

Lastly, Plaintiff identifies Michael Saussy, an African-American male, as a comparator. (Doc. 34 at 25.) In January 2019, Saussy was operating a crane for GPA. (Doc. 34, Attach. 7 at 4.) At some point, a container being loaded onto a vessel struck loaded containers already on the vessel. (Id. at 4.) The impact caused a latch on one of the containers to dislodge and injure a longshoreman on the vessel. (Id. at 4.) Port Police interviewed Saussy and, at that time, Saussy claimed that his crane was not over the vessel and could not have caused the latch to dislodge. (Id. at 4.) Saussy did not face any discipline for the incident.

Plaintiff argues that Saussy lied to Port Police about his involvement in the incident and, therefore, violated an "A" Rule of GPA's Code of Conduct. (Doc. 34 at 25.) Plaintiff also argues that Defendant treated Saussy more favorably because Saussy was not terminated for lying to the Port Police. (Id.) However, Plaintiff has failed to present evidence that Saussy lied to the Port Police or that Defendant knew Saussy lied to the Port Police. See Summers v. City of Dothan, Al., 444 F. App'x 346, 348 (11th Cir. 2011) ("[P]roffered comparators' actions are only relevant if it is shown that the decision maker knew of the prior similar acts

and did not discipline the rule violators."). Moreover, even if Saussy lied to Port Police and Defendant knew he lied, Saussy's misconduct is materially different from Plaintiff's misconduct. Accordingly, the Court finds that Saussy is not a proper comparator because he is not similarly situated in all material respects. Because Plaintiff has failed to identify a similarly situated comparator, the Court finds that Plaintiff has failed to establish a prima facie case of race discrimination. As a result, Defendant's motion (Doc. 29) is **GRANTED**. The Court, however, will address the remaining steps in the <u>McDonnell Douglas</u> framework.

B. <u>Defendant's Non-Discriminatory Reason and Pretext</u>

Defendant also argues that even if Plaintiff could establish a prima facie case of discrimination, Plaintiff cannot establish that Defendant's legitimate, non-discriminatory reason for Plaintiff's termination was pretextual. (Doc. 29, Attach. 1 at 17.) Under the <u>McDonnell Douglas</u> framework, once a plaintiff establishes a prima facie case of discrimination, an employer "must articulate a legitimate, nondiscriminatory reason for the challenged employment action." <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1024 (11th Cir. 2000). "However, the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." <u>Id.</u> (citation omitted). "If the defendant articulates one or more such reasons," the plaintiff must "come forward with evidence, including the

previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. (citation omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Id. at 1024-25 (citation omitted).

Here, the Court finds that Defendant has met his burden to proffer a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant maintains that Plaintiff was terminated due to his insubordination, namely, his refusal to comply with Defendant's demand that he go home on August 8, 2017. See Jiann Min Chang v. Ala. Agric. & Mech. Univ., 355 F. App'x 250, 252 (11th Cir. 2009) (finding that an employer proffered a legitimate, non-discriminatory reason for termination when it cited the former employee's insubordination and refusal to comply with his supervisor's demand); see also Hogue v. Sec'y, U.S. Dep't of the Army, 718 F. App'x 877, 879-80 (11th Cir. 2017) (finding insubordination a legitimate, non-discriminatory reason for an employee's termination). Defendant and Plaintiff both testified that Defendant told Plaintiff to go home. Plaintiff testified that he told Defendant "I am not going home, I did nothing wrong." (Doc.

29, Attach. 4 at 22, 23.) Plaintiff testified that he repeated his refusal at least twice and several other employees confirmed that Plaintiff refused to go home multiple times. Moreover, Defendant and six different GPA employees—Simmons, Chisholm, Wisham, Rohde, Altman, and McCarthy—cited Plaintiff's insubordination as the reason Plaintiff was terminated.

At this point, the burden shifts back to Plaintiff to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the [Defendant] were not the real reasons for the adverse employment decision." Chapman, 229 F.3d at 1024. "To show pretext, [an employee] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.' " Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted). However, an employee is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030. Rather, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

The Court finds that Plaintiff has not met his burden to show that Defendant's proffered reason is pretextual. Plaintiff first

argues that Defendant's decision to terminate him must have been
motivated by discrimination because Plaintiff actually went home
soon after Defendant's demand. (Doc. 34 at 26.) Although Plaintiff
has presented evidence that he exited the GPA gate at 6:05 p.m.,
Plaintiff has not shown that Defendant knew Plaintiff went home.
In fact, the evidence shows that Defendant exited the GPA gate
before Plaintiff (Doc. 34, Attach. 24 at 19) and, therefore, could
not know that Plaintiff actually complied with his demand. At that
time, Defendant only knew that Plaintiff refused his direct order
to leave and that Plaintiff repeated his refusal several times.
Defendant also testified that Plaintiff "was not fired for clearing
the gate within five minutes. [Plaintiff] was fired for not
following a reasonable direct order . . . . He said out of his
mouth he was not going to do that." (Doc. 34, Attach. 24 at 13.)
Plaintiff's eventual compliance with Defendant's direct order does
not negate the fact that Plaintiff refused the order multiple times
in Defendant's presence. See Jiann Min Chang, 355 F. App'x at 253
(concluding that where a plaintiff was terminated for refusing his
supervisor's demand, "[plaintiff's] arguments regarding . . . his
eventual compliance with [his supervisor's] demand, are meritless"
because his compliance has "no bearing on whether [plaintiff]
behaved unprofessionally and disrespectfully during the
conversation with [his supervisor] . . . .").

Next, Plaintiff argues that Defendant's reason is pretextual because Defendant has previously made racially-charged comments about other white crane operators. (Doc. 34 at 28-29.) Specifically, Tiaisha Randolph, a former assistant manager of crane operations, testified that in 2018 Defendant referred to a lunch between white crane operators as a "KKK meeting." (Doc. 34, Attach. 26 at 4-5; Doc. 38, Attach. 10 at 6-7.) While the Court recognizes that Defendant's alleged comment is offensive and inappropriate, Plaintiff does not provide any evidence that Defendant's racially-charged remark was directed at Plaintiff or that Plaintiff attended the lunch that Defendant referenced. Moreover, Defendant allegedly made this remark in the summer of 2018, approximately a year after Plaintiff was terminated. "Plaintiff cannot survive summary judgment based on ambiguous, isolated stray remarks alone, that are unrelated to the employment decision at issue." Goode v. Wings of Alpharetta, Inc., No. 1:11-CV-1337-WSD-JSA, 2013 WL 997669, at *13 (N.D. Ga. Jan. 18, 2013). The Eleventh Circuit has repeatedly indicated that a discriminatory comment, taken alone, is insufficient to present a question of material fact on the issue of discriminatory intent. See Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) (noting that because a supervisor's alleged comment that another employee, not the plaintiff, did not deserve her job because that employee was a woman was "an isolated comment, unrelated to the decision to

27

fire [Plaintiff], it, alone, is insufficient to establish a material fact on pretext."); Ash v. Tyson Foods, Inc., 190 F. App'x. 924, 926 (11th Cir. 2006). Thus, Plaintiff cannot show pretext based on Defendant's stray and unrelated comment.

Finally, Plaintiff argues that Defendant's reason is pretextual because Defendant has made "intimidating statements" to his employees about reporting to HR and Defendant really fired Plaintiff for attempting to meet with someone in HR. (Doc. 34 at 29.) Plaintiff did produce evidence that Defendant made intimidating statements about his employees reporting to HR. Specifically, Brian Jackson claimed that Defendant made several intimidating statements, including:

- If you people keep going to HR (white house) on me, then I promise you—you will lose your jobs.
- If you throw me under the bus, then I will be like an eighteen-wheeler and run you over eighteen times.
- You will be pencil whipped if you go to HR.

(Doc. 34, Attach. 27 at 9.)

Again, the Court recognizes that Defendant's statements are inappropriate, however, they do not establish that Defendant's proffered reason for terminating Plaintiff is pretext for discrimination. Even if Defendant was upset that Plaintiff spoke to HR and told Plaintiff to "have his facts straight," Plaintiff has not shown that Defendant's real reason for terminating him was discrimination. Rather, Defendant has produced sufficient evidence

that Plaintiff's refusal to follow a direct order lead to his
termination.

More importantly, Defendant was not the ultimate
decisionmaker in the decision to terminate Plaintiff. "[A]
non-decisionmaker employee's discriminatory remarks are 'not
probative of a discriminatory intent behind [an employee's]
termination[,]' " and therefore cannot be used to establish
pretext. Payne v. Goodyear Tire & Rubber Co., 760 F. App'x 803,
808 (11th Cir. 2019) (quoting Standard v. A.B.E.L. Servs., 161
F.3d 1318, 1330 (11th Cir. 1998)). See also Lovett v. Georgia-
Pacific Consumer Prods., LP, 418 F. Supp. 3d 1311, 1323 (S.D. Ga.
2019) (finding a supervisor's racially-charged remarks did not
establish pretext because "there [was] no evidence that [the
supervisor] had any impact on the decision to terminate [p]laintiff
or that [the supervisor] influenced the decisionmakers"). Although
Defendant provided his perspective on the altercation and met with
Simmons to review the incident, Plaintiff has produced no evidence
that Defendant had any significant impact on the decision to
terminate Plaintiff. Besides his meeting with Simmons, Defendant
did not meet with any of the ultimate decisionmakers. Rather,
Altman, Rohde, Wisham, and McCarthy reviewed the investigation
materials and the witness statements and independently concluded
that Plaintiff's conduct warranted termination. As the Eleventh
Circuit has "repeatedly and emphatically held, . . . employers are

29

free to fire their employees for a good reason, a bad reason, a
reason based on erroneous facts, or for no reason at all, as long
as its action is not for a discriminatory reason." Flowers v. Troup
Cty., 803 F.3d 1327, 1338 (11th Cir. 2015). Thus, even if
Defendant's account of the exchange with Plaintiff was erroneous,
the decisionmakers' reliance on his account does not make
Plaintiff's termination discriminatory. Because Plaintiff cannot
establish a prima facie case of discrimination and cannot show
that Defendant's proffered reason is pretext for discrimination,
Defendant's motion for summary judgment (Doc. 29) is **GRANTED.**

## II.  MOSAIC OF CIRCUMSTANTIAL EVIDENCE

In the alternative, Plaintiff argues that even if he cannot
satisfy the McDonnell Douglas framework, his claim should survive
summary judgment because he has produced a mosaic of circumstantial
evidence of Defendant's discriminatory intent. (Doc. 34 at 30-31.)
"[A] plaintiff will always survive summary judgment if he presents
circumstantial evidence that creates a triable issue concerning
the employer's discriminatory intent." Smith v. Lockheed-Martin
Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of
fact exists if the record, viewed in a light most favorable to the
plaintiff, presents 'a convincing mosaic of circumstantial
evidence that would allow a jury to infer intentional
discrimination by the decisionmaker.' " Id. (quoting Silverman v.
Bd. of Educ., 637 F.3d 729,734 (7th Cir. 2011)).

As circumstantial evidence of Defendant's alleged discriminatory intent, Plaintiff highlights Defendant's racially-charged comments about white crane operators and Defendant's "vindictive, bullying comments and actions . . ." about his employees going to HR. (Doc. 34 at 31.) While the Court recognizes that Defendant's comments were inappropriate, Plaintiff has failed to show that Defendant's racially-charged comments were related to Plaintiff's termination. See Williams v. Cleaver-Brooks, Inc. No. 7:11-CV-144 (HL), 2012 WL 6151141, at *7-9 (M.D. Ga. Dec. 11, 2012) (finding that the plaintiff failed to present enough evidence to create a convincing mosaic of circumstantial evidence where the plaintiff's supervisor allegedly called the plaintiff a racial slur because "none of the evidence identified by [p]laintiff . . . relates to his termination or can be attributed to the decision makers who terminated [p]laintiff"); Dorvil v. Advance Stores Co., Inc., No. 10-60036-Civ, 2011 WL 6069362, at *14-15 (S.D. Fla. Dec. 6, 2011) (finding plaintiff failed "to create an inference of discrimination" where plaintiff's supervisor made isolated and stray comments about plaintiff's national origin because "the relationship between [the supervisor's] comments and [the plaintiff's] termination [was] simply too attenuated"). Moreover, as discussed above, any threatening comments made by Defendant about his employees speaking with HR cannot be attributed to the HR Department or the

other GPA executives' ultimate decision to terminate Plaintiff. Ultimately, Plaintiff has failed to produce a significant evidentiary record that shows Defendant considered Plaintiff's race in his recommendation to terminate Plaintiff. See Smith, 644 F.3d at 1324, 1329-35 (concluding that a plaintiff could survive summary judgment because he produced several pieces of evidence that suggested his employer "had a substantial incentive to discipline white employees more harshly than black employees . . . [and] that [the employer] consciously injected race considerations into its discipline decision making . . . ."). The Court finds that Plaintiff's evidence is not sufficient to establish the "convincing mosaic" of discrimination required to survive summary judgment.

CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 29) is **GRANTED**. As a result, Plaintiff's claims are **DISMISSED**. The Clerk is **DIRECTED** to close this case.

SO ORDERED this _17th_ day of September 2020.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

32